**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: January 18 2019

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| In Re: | Case No.: 17-31398 |
| Jeffrey L. Cheney and Rosette Smith-Cheney, | Chapter 7 |
| Debtors. | Adv. Pro. No. 17-3086 |
| | Hon. Mary Ann Whipple |
| Raymond P. Johnston, et al., | |
| Plaintiffs, | |
| v. | |
| Jeffrey L. Cheney, et al., | |
| Defendants. | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiffs' complaint to determine the dischargeability of a debt allegedly owed to them by Defendant Jeffrey Cheney.[1] Defendant is a debtor in the underlying Chapter 7 case. Plaintiffs allege that the Defendant fraudulently induced them to enter into a certain home improvement construction contract. Plaintiffs contend that Defendant owes them a debt resulting from his fraudulent representations that should be excepted from

---

[1] The court previously granted Defendants' motion for summary judgment with respect to Plaintiffs' claim against Defendant Rosette Smith-Cheney.

his Chapter 7 discharge. Although not specifically set forth in their complaint, Plaintiffs are proceeding under 11 U.S.C. § 523(a)(2)(A).

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) as a civil proceeding arising under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of debts are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

At trial, Defendant moved for judgment in his favor after Plaintiffs concluded their presentation of evidence and after Plaintiffs were fully heard on the issues. The court construed Defendant's motion as a request for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7052. This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) and (c). Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below and in open court at the conclusion of Plaintiffs' case, the court finds that Defendant is entitled to judgment in his favor.

## FINDINGS OF FACT

This proceeding involves a contract for new construction and improvements that were to be completed by Defendant Jeffrey Cheney ("Cheney") at Plaintiffs' home. Cheney operates his business through JLC Home Improvement LLC. Plaintiffs knew Cheney since 2014, having met him through Cheney's wife, who was friends with Plaintiff Diane Johnston and having shared Christmas dinner that year with Defendants at Defendants' home. At that time, Plaintiffs discussed their tentative plans to either move to a new home or renovate their existing home.

In April 2016, Plaintiffs had decided not to move and instead to renovate their existing home. The renovation would include demolishing the original farmhouse portion of their home that was built in the mid-1800's and build an addition to the portion of their remaining home that was built in the 1970's. On or about April 27, 2016, Plaintiffs invited Cheney and his wife to Easter dinner, at which time they discussed their plans with Cheney, as he had expressed an interest in the project. Diane Johnston had prepared a drawing of the floor plan for the new addition with room dimensions specified. [*See* Pl. Ex. 1]. She told Cheney that her drawing showed inside room dimensions.

The parties discussed whether Cheney had the ability to handle the project and whether an architect should be hired to prepare a blueprint for the new addition. Cheney told Plaintiffs that he was able to do the work for them and had not long ago completed a similar job. He provided Plaintiffs with the name of the customer for whom he completed that job. He also told Plaintiffs that they would not have to incur the cost of an architect as he could prepare the required blueprint. Diane Johnston testified that Cheney was very confident regarding his ability to complete the project and that Plaintiffs told Cheney they were willing to put sweat equity into the project.

On or about June 6, 2016, Plaintiffs entered into a contract with Cheney for the construction project, requiring him to detach the older portion of Plaintiffs' house from the 1970's portion, to which a new addition would be attached that would include a basement. [Pl. Ex. 3]. The older portion of the house would be demolished by another contractor. Before they entered into the contract, Cheney had already prepared and delivered to Diane Johnston blueprints for her to submit for approval to the Wood County Building Inspector. She submitted the blueprints on June 6, 2016. After review on June 9, 2016, the plans receive a "partial pass," [Pl. Ex. 6, p. 2], requiring, according to Diane Johnston, only one revision. Gary Swope ("Swope"), a Wood County plans examiner and building inspector, testified that it was not uncommon for a contractor to have to revise plans submitted for approval. Cheney made the required revision, and the plans were approved on June 10, 2016. [*Id*.].

Cheney, with a crew of workers, began work on the project in June. Materials were purchased, including, among other things, lumber, insulation, trim, drywall, windows. They worked six-hour days, including lunch and breaks, five days a week.

Cheney successfully detached the older portion of Plaintiffs' house that was to be demolished. A dispute arose regarding the manner and extent to which the exposed portion of the remaining house should be sealed to protect it from the weather. Although Cheney did try to seal the exposed portion with plastic, a severe storm in August resulted in water damage in a hallway and laundry room in Plaintiffs' house, ruining flooring, insulation and drywall. Ray Johnston then applied additional material to seal the house, and no further water issues due to the detachment occurred.

While the footer and the foundation were completed and passed inspection, Ray Johnston testified that his first indication of a problem with the new construction occurred when he noticed that the floor joists of the new addition did not meet the joists of the existing house. He also testified that the basement stair construction was "a big red flag," as the risers and treads were not uniform. Issues also arose involving water leakage around windows and doors installed in the new addition. [*See* Pl. Ex. 18, Photo

3

Nos. 8, 9. 12, 13]. Plaintiffs insisted on Cheney removing all of the windows and re-caulking them, which he did. However, according to Ray Johnston, there were still water leakage issues that were later corrected by Mark Stratmann ("Stratmann"), a contractor hired by Plaintiffs to correct and complete the construction after Cheney left the job.

Several other issues arose while Cheney was on the job. The size of the bedroom constructed by Cheney was smaller than what Plaintiffs had planned and resulted in less space for the bathroom and walk-in closet than what was provided for in Diane Johnston's sketch that had been given to him. He constructed outside overhangs over two doors that were too low to install a storm door. Diane Johnston testified that she showed Cheney the style of overhang that she wanted but that he insisted on using the overhang that he was building. There was also a dispute regarding the necessity of installing ice guards on the roof; however, Cheney eventually did install them. Diane Johnston testified that, at one point, she heard Cheney muttering that the project was way over budget.

A rough electrical inspection of the project was scheduled to occur on September 9, 2016, the date Cheney had told Plaintiffs the electrical would be done. However, a dispute arose regarding the necessity of the back generator being hooked up before the inspection, with Diane Johnston insisting that it should be and Cheney insisting that it was not necessary. Diane Johnston cancelled the inspection. On September 9, Cheney and his crew left the job. Notwithstanding that Plaintiffs had paid Cheney $62,680.74 of the $70,057.29 contract price and that construction was only approximately thirty percent complete, Cheney did not return to the job or take Plaintiffs' phone calls thereafter.

Diane Johnston testified that after September 9, she contacted the individual whose name Cheney had provided and for whom he had completed a job on a similar scale as Plaintiffs' project. The individual told her that his experience with Cheney as a builder "was fine."

Plaintiffs also requested a consultation with a building inspector. Swope inspected the new construction on September 14, 2016. He found that several items were not in compliance with the 2013 Residential Code of Ohio and/or manufacturer's specifications. [*See* Pl. Ex. 6, p. 1-2]. Swope testified that trusses used in construction must be used as built by the manufacturer and may not be altered unless engineering approval is obtained through the truss manufacturing company. The new construction used trusses the ends of which were impermissibly cut in order to fit with girder trusses, which are the main support trusses. There were joist hangers missing on roof trusses required to transpose weight to the girder.

The basement stairs were also improperly built, obviously so. The risers and treads of the stairs

were not uniform. [*See* Pl. Ex. 20, Photo # 1]. Swope testified that the building code requires them to be the same. The headroom going down the stairs was less than the required six foot eight inches. And an I-joist, which Swope explained is to be utilized as a floor joist, and a sturdy box were improperly used as a beam to carry the weight of the stairs. [*Id.* at Photo # 8]. Ray Johnston testified that Cheney told him that he had previously built stairs on only one other occasion.

Stratmann was then hired to correct and complete the construction at Plaintiffs' home, without amending the plans, at a $56,000 cost to Plaintiffs. His work included reconstructing the two outside overhangs, re-caulking and repairing window and door flashing, correcting the structural issues, rebuilding the stairs, and otherwise completing the project. In doing so, he used materials that had been purchased by Cheney. However, there was not enough trim, drywall and insulation at the job site and additional materials had to be purchased.

On December 30, 2016, Plaintiffs commenced an action in the Wood County, Ohio, Court of Common Pleas ("State Court"), alleging, among other things, that they were fraudulently induced to enter into the renovation contract when Cheney knowingly and with intent to deceive misrepresented that he could prepare plans for and complete the renovation project that they had discussed with him and that Cheney had previously successfully constructed projects on such a scale as Plaintiffs' proposed project. [Doc. # 1, Ex. A, ¶¶ 30-33].

Defendants filed their petition for relief under Chapter 7 of the Bankruptcy Code on May 5, 2017. [Case No. 17-31398]. Plaintiffs timely commenced this adversary proceeding, alleging that Defendants fraudulently induced them to enter into the construction contract for renovation of Plaintiffs' home and that as a result Defendants owe them a debt that is nondischargeable. Plaintiffs' dischargeability complaint incorporates their complaint filed in State Court. [*See* Doc. # 1, ¶ 2]. The State Court action had not proceeded to judgment before Defendants commenced their bankruptcy case and that action was stayed.

## LAW AND ANALYSIS

Although not specified in the complaint, Plaintiffs have proceeded under 11 U.S.C. § 523(a)(2)(A). A creditor must prove exceptions to dischargeability for individual debts under 11 U.S.C. § 523(a), including the exception for fraud, by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, [or] services,... to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." In order to except a debt from discharge under this section due to false pretense or false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81.

A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Rembert,* 141 F.3d at 281-82. A finding of fraudulent intent may be made based on circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). However, "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Final Servs. v. Szczepanski (In re Szczepanski),* 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991). While Plaintiffs have shown that Cheney breached their construction contract and owes them a debt as a result thereof, as discussed below, they have failed to show a debt obtained by a fraudulent misrepresentation.

Plaintiffs assert that three misrepresentations were made by Cheney: (1) that he could prepare plans for the renovation of their home; (2) that he was capable of completing the renovation given the scale of the project; and (3) that he had previously successfully constructed a project on scale similar to Plaintiffs' project.

The first element of a claim under § 523(a)(2)(A) requires both proof of a material misrepresentation and proof that the defendant knew the representation was false or that it was made with gross recklessness. In this case, Cheney drew plans for the renovation project that complied with the applicable building code and that were approved by the Wood County Inspection department. That he was able to prepare such plans was not a false representation. Plaintiffs rely on the fact that he did not prepare plans with the exact room sizes that they had requested. While that fact constitutes a breach of contract, it does not demonstrate that he was unable to draw proper plans.

As to the third alleged misrepresentation, there is no evidence that Cheney did not successfully construct a project on a similar scale to Plaintiffs'. In fact, Diane Johnston testified that she called

6

Cheney's former customer, whose name had been provided to Plaintiffs by Cheney as a customer for whom he had completed such a project, and that customer voiced no complaints. Except for her testimony, the record is silent on the issue. Plaintiffs did not show that Cheney's statement was false.

The court does find that Cheney's representation that he had the ability to build the addition and complete the renovation project at Plaintiffs' home was a false statement. The court finds Plaintiffs' testimony and the testimony of Swope and Stratmann credible. While numerous issues arose regarding Cheney's work, some of which were more in the nature of a disagreement regarding the scope of the contract, there are critical issues in Swope's inspection report about which he testified that convince the court that Cheney did not have the ability to properly construct the addition to Plaintiffs' home. Specifically problematic are the trusses used in the structure of the addition that were not in compliance with the applicable building code and/or manufacturer's specifications and the improperly built stairs. Both the trusses and the stairs were a critical and basic part of the construction job. The court finds the problems identified by Swope regarding the trusses and the stairs to be emblematic of a person who does not have the ability to do the job required by Cheney's contract with Plaintiffs.

While Plaintiffs have shown that Cheney's statement regarding his ability to complete the construction and renovation project at their home was a material misrepresentation, there is no evidence that Cheney knew that he was not able to complete the project or that he made the representation with gross recklessness as to its truth. As Diane Johnston testified, in April 2016, Cheney was very confident that he could do the job. He had previously built a set of stairs, and there is no evidence that the stairs were defective. And there is no evidence that Cheney encountered similar problems with other similar projects completed by him such that he should have known that he lacked the ability to complete the project contemplated by Plaintiffs.

There is also no evidence that Cheney intended to deceive Plaintiffs. Work went well during the first month, except for the dispute regarding what needed to be done to seal in the exposed wall after the house was separated. Cheney showed up to work five days a week with his crew, presumably whom he had to pay. He ordered lumber, drywall, insulation, and windows, among other things. The court does not believe his mindset was to defraud Plaintiffs. While Cheney's muttering heard by Diane Johnston that the project was way over budget may explain some of the deficiencies in his work that resulted in a breach of contract, it does not demonstrate fraud at the outset.

## CONCLUSION

For all the foregoing reasons, the court finds that Plaintiffs have failed to prove by a preponderance

7

17-03086-maw    Doc 52    FILED 01/18/19    ENTERED 01/18/19 16:15:53    Page 7 of 8

of the evidence that the asserted representations made by Cheney were fraudulent and that Cheney owes them a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A).

The court will enter a separate judgement against Plaintiffs and in favor of Defendants.

###